REGINALD C. REILLY AND JACQUELINE L. REILLY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reilly v. Commissioner
Docket No. 45361-86.
United States Tax Court
T.C. Memo 1989-134; 1989 Tax Ct. Memo LEXIS 134; 56 T.C.M. (CCH) 1574; T.C.M. (RIA) 89134; March 29, 1989. Reginald C. Reilly, pro se. John C. McDougal, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b) [1]
1980
$  2,862.12
$  5,479.56
1981
30,419.00
20,869.00
$ 33,281.12
$ 26,348.56
After concessions by both parties, [2] the issues for decision are (1) whether corporate funds paid to Reginald C. Reilly during 1981 were nontaxable loans or were taxable income and (2) whether all or part of any underpayment *136 of tax during 1981 was due to fraud which would cause Reginald C. Reilly to be liable for an addition to tax under section 6653(b). Respondent concedes that Jacqueline Reilly is not liable for the addition to tax under section 6653(b). FINDINGS OF FACT Some of the facts are stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners are husband and wife who resided in Richmond, Virginia at the time they filed the petition. Jacqueline Reilly is a petitioner only because she filed a joint return with her husband and, accordingly, all references to petitioner will be to her husband, Reginald C. Reilly. During 1981, petitioner was president of Building Air Systems, Inc. (BASI), a specialty contractor dealing in sheet metal. All BASI employees, including Raymond Gilbert Lewter, Jr. (Lewter), the in-house accountant/bookkeeper, reported exclusively to petitioner. BASI had been solely owned by Poole & Kent Corporation until 1980, when all the *137 BASI stock was sold to McKamish Chesapeake, Inc. (McKamish Chesapeake). Petitioner owned 10 shares (0.29 percent) of the outstanding stock in McKamish Chesapeake. On October 27, 1980, petitioner was issued a $ 6,374.39 check that represented a taxable distribution of funds in the Poole & Kent profit sharing plan. Also during 1980, petitioner cashed a $ 1,000 bonus check from RKW Investment Co., Inc., a corporation in which he was the president and sole shareholder. Petitioner reported neither of these amounts on his 1980 Federal income tax return. During 1980, BASI received two $ 5,000 checks from an insurance company. These checks represented proceeds from a claim for damage sustained to a BASI vehicle when BASI was still a Poole & Kent subsidiary. The checks were initially kept by Lewter in a drawer because of uncertainty over whether the proceeds belonged to Poole & Kent or to McKamish Chesapeake. Lewter never recorded the receipt of the checks on the company books. In September 1980, with petitioner's approval, Lewter put the checks in a savings account. In June 1981, petitioner asked Lewter if he could "borrow" the $ 10,000 in the savings account, even though Lewter *138 did not have any authority to make loans of corporate funds. On June 26, 1981, Lewter withdrew the $ 10,000 from the savings account in the form of a cashier's check payable to BASI and gave the check to petitioner. Petitioner endorsed the cashier's check "Building Air Systems. Pay to the order of R. C. Reilly. For Deposit Only. R. C. Reilly." Petitioner also signed a note for the $ 10,000 with interest at 6 percent. Lewter did not keep the note in the BASI records, but instead kept it at his home. He did not report the note on the corporate books, and he never told anyone else at BASI or at McKamish Chesapeake about the "loan." The $ 10,000 was not reported as income on petitioner's 1981 return. McKamish Chesapeake had a bonus arrangement for salaried employees of BASI. Petitioner would recommend bonuses for the various employees, and Harold McKamish (McKamish) and Leo O'Dea (O'Dea), the chief operating officers of McKamish Chesapeake, would approve them. In October 1981, petitioner asked for a $ 25,000 bonus for himself. O'Dea told him that such a bonus was out of the question because BASI had so much uncompleted work at the time. O'Dea and McKamish subsequently discussed *139 and approved a $ 15,000 bonus for petitioner. They also agreed to loan him $ 10,000. O'Dea advised petitioner of this decision in early December 1981. O'Dea would have been willing to lend petitioner another $ 5,000 if he really needed it. On December 16, 1981, petitioner received a $ 5,000 check which was the first portion of the $ 10,000 loan. A month later he received another $ 5,000 check which was the second part of the loan. Petitioner executed notes for these loans. Petitioner took $ 10,000 of the bonus on June 18, 1982. In late summer of 1981, petitioner started to remodel his house, and O'Dea gave him permission to order materials through the corporation. By ordering through the corporation, petitioner would get the company discount and also would get 2 to 3 months of credit since BASI had that length of time in which to pay its suppliers. Petitioner contends that when he obtained O'Dea's authority to charge items to the company, he and O'Dea talked about the possibility that petitioner would receive bonuses down the road that would repay the cost of the items. O'Dea says, however, that he expected petitioner's repayment to be almost simultaneous with the charge. *140 When an employee purchased materials through the company, he was expected to set up a job number for himself to which all purchases would be charged. Petitioner should have known this. During 1981, petitioner purchased $ 34,365 of building materials through BASI. Rather than setting up a job number, he told Lewter to charge the expenses to three of the biggest jobs that BASI was doing at that time. This did not increase the cost of those jobs to the persons for whom the work was being done because there already was an agreed upon cost of those jobs. Petitioner claims that he did not set up a job number for the materials because it was too much bother. Lewter says, however, that he would have set up a job number for petitioner if he had been asked to do so. During the annual audit for 1981, the independent auditors did not discover that petitioner had charged personal expenses to the three jobs. Petitioner did not report any of the $ 34,365 of building materials on his 1981 tax return. Petitioner not only charged materials to BASI but also carried on the BASI payroll the workers who were working on his house. BASI paid the workers a total of $ 21,437 for the work done on *141 petitioner's house. BASI policy forbids employees to charge labor to the corporation. Petitioner did not report any of the $ 21,437 of labor on his 1981 tax return. In late 1982, respondent began a criminal investigation of petitioner. At the initial interview on November 2, 1982, the special agent advised petitioner of his rights and asked him about any loans he took from the corporation. Petitioner said he had borrowed $ 10,000 and signed a note. He said nothing about any other loans. Petitioner also told the special agent that BASI paid none of his personal expenses other than travel and furnishing him with a company car. Several days later, on November 8, 1982, the special agent came to the BASI office to interview Lewter. During the interview, petitioner came into the room and asked what the investigation was about. The agent told him they were looking for personal expenditures made on his behalf and paid for by the corporation. Petitioner said that he recalled an occasion, while building his home, when metal used in fabrication of a barbecue grill had come from BASI. McKamish and O'Dea did not learn about the expenses petitioner had charged to BASI until late 1982, *142 when respondent's special agent contacted them. After a meeting with their accountant in early 1983, they decided to treat the materials and labor billed to the corporation as indebtedness of petitioner. On April 14, 1983, O'Dea and McKamish forgave this indebtedness because petitioner had been a valued employee, and also when petitioner was hired he was told that he would get bonus compensation in the future. Petitioner contends that he first realized the real magnitude of the amount charged to the corporation around November 1982. However, Lewter kept a list of the job-charged personal expenses and also kept petitioner informed of the cumulative total. On one occasion, Lewter had shown petitioner the list and asked him if he knew he was "accumulating a lot of money on his house." Petitioner had said he did know and told Lewter to "keep accumulating it." After the debts involving the construction of the house had been forgiven, McKamish learned that the $ 10,000 in insurance proceeds had been "borrowed" by petitioner. He wrote petitioner a letter stating that he had been unaware of this transaction, that he did not consider the $ 10,000 to have been a loan and that the $ *143 10,000 was not part of the indebtedness forgiven on April 14, 1983. The letter also stated that petitioner would be expected to make this amount good to the corporation. Although McKamish followed this first letter up with two other letters demanding repayment of the $ 10,000, petitioner never responded to any of the letters. On March 26, 1985, petitioner was indicted under section 7201 on charges of income tax evasion for 1980 and 1981. On August 9, 1985, a jury convicted petitioner for income tax evasion for 1980, and acquitted him for 1981. On February 19, 1986, the Court of Appeals for the Fourth Circuit upheld the 1980 conviction. The 1980 conviction was based on the omission from petitioner's 1980 return of the $ 6,374.39 profit-sharing distribution from Poole & Kent and the $ 1,000 bonus paycheck from RKW Corporation. OPINION This case involves two issues: (1) the inclusion of certain proceeds in petitioner's 1981 income and (2) petitioner's liability for an addition to tax for fraud under section 6653(b). Each will be discussed separately. Loan or income
Petitioner asserted that his receipt in 1981 of the $ 55,802 in materials and labor used in his home *144 and the $ 10,000 in insurance proceeds were loans rather than income. His briefs, however, present no arguments on this issue. Nevertheless, for completeness of the record and to lay the groundwork for our discussion of section 6653(b), we will discuss various arguments petitioner could have raised to support his position. First, petitioner's receipt of the amounts possibly could be viewed as a portion of the $ 15,000 bonus and the $ 10,000 loan approved in 1981. However, if any of these amounts were part of the bonus they should have been reported as income when received. None of these amounts could have been part of the $ 10,000 loan because that loan was made by two $ 5,000 cash payments in 1981 and 1982. O'Dea testified that he would have been willing to loan petitioner an additional $ 5,000, but there is no evidence that such an additional loan was ever requested by petitioner or granted by O'Dea. Second, petitioner might argue that the materials were merely part of the arrangement to order through the company. However, O'Dea only intended for petitioner to temporarily avail himself of the corporate discount, with petitioner reimbursing the corporation for the amounts *145 charged. There was no approval of a long-term loan. Petitioner presented no evidence that he intended to promptly repay, and, thus, we must conclude that petitioner did not intend to take a short-term loan. Third, it could be argued that McKamish's and O'Dea's eventual decision to treat the amounts as loans indicated that the amounts were loans when made. However, O'Dea testified that he did not agree in advance to a loan of the funds used to improve petitioner's house, and it was only afterwards that it was decided to treat the transaction as a loan. Thus, for tax purposes, there was no loan in 1981. . Fourth, petitioner might argue that since he was the president of BASI he had the authority to make a loan to himself and, thus, that the necessary consensual relationship existed. In this regard, he might point out that O'Dea testified that petitioner "had complete authority over [BASI]. * * * He could have made himself [a] $ 100,000 loan; he could have written a check for a million dollars out of that corporation. He did not need my authorization to do these things." However, we believe that O'Dea was talking *146 about the power to write checks, not the authority to loan money. This interpretation is supported by O'Dea's and McKamish's testimony at the criminal trial that petitioner had no authority to loan company funds. It also is clear that the decision to loan $ 10,000 was made by McKamish and O'Dea and, thus, they and not petitioner had the authority to decide what loans the corporation would make to petitioner. We conclude that petitioner is liable for the entire deficiency determined by respondent. [3]
Section 6653(b)
In order for petitioner to be liable for an addition to tax under section 6653(b), respondent must prove by clear and convincing evidence that a portion of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b). In order to establish fraud, respondent must show that petitioner filed the return with the specific intent *147 to evade a tax he believed to be owing. . Petitioner's acquittal in the criminal proceeding for the 1981 taxable year does not bar imposition of the section 6653(b) addition to tax for that year. . There is much evidence that petitioner intended to evade tax. First, petitioner had the labor and supplies charged to other projects and failed to keep adequate books and records. . Second, petitioner did not mention any of the purported loans to the special agent when asked about the loans. He just mentioned the $ 10,000 loan that was approved at the same time as the $ 15,000 bonus. Petitioner also told the special agent that BASI paid none of his personal expenses other than travel and furnishing him with a company car. It is possible, but not probable, that the purported payment of personal expenses slipped petitioner's mind because he had not known ahead of time that the special agent would interview him. However, several days later the special agent told him that respondent *148 was looking for personal expenditures made on petitioner's behalf and paid for by the corporation. Petitioner said that he recalled an occasion, while building his home, when metal used in fabrication of a barbecue grill had come from BASI. He did not mention any of the other expenditures. We do not believe that petitioner could remember an expenditure on a barbecue grill, yet not remember over $ 55,000 of remodeling expenditures. Petitioner's statements to the special agent are evidence of fraud. . The only halfway plausible argument that petitioner could make on his behalf is that he had been told that he would receive bonuses in the future, and he accordingly believed that the various payments were advances on future bonuses which should not be reported as income. There is no evidence other than petitioner's self-serving testimony that the corporate payments were intended to be advances on future bonuses. Respondent has carried his burden of proof, and petitioner accordingly is liable for the addition to tax under section 6653(b). Petitioner's 1981 tax return was not filed on time as it was received by *149 respondent on August 16, 1982. Accordingly, for purposes of determining the underpayment on which the addition to tax is calculated, the tax shown on the return is not taken into account. Sec. 6653(c)(1). Thus, the addition to tax is 50 percent of $ 41,738, the 1981 tax liability. Petitioner raised the issue of the statute of limitations in his petition. In his answer, respondent admitted that the notice of deficiency was mailed more than 3 years after petitioner filed his tax return. Neither party addressed the statute of limitations issue in his brief. Due to our finding of fraud with intent to evade tax, the notice of deficiency was timely. Sec. 6501(c)(1). Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner's handwritten briefs were less than four pages long and do not mention certain issues raised in his petition. We treat those issues as conceded.↩
3. It appears that petitioner included the funds in income in a subsequent year, which would result in a double payment of tax. We do not know if the statute of limitations has run on the subsequent year. If it has, the mitigation provisions of sections 1311-1314 may entitle petitioner to a refund of the tax paid in the later year.↩